Rebecca HENDRIX, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. 2:02CV 0532 DAK.

United States District Court,
D. Utah,
Central Division.

Feb. 19, 2004.

Scott Patrick Bates, Maggie H. Abuhaidar, Esq., U.S. Attorney's Office, for defendant.

John J. Borsos, Esq., Salt Lake City, UT, for plaintiff.

## MEMORANDUM OPINION AND ORDER

KIMBALL, District Judge.

Plaintiff Rebecca Hendrix filed this action seeking judicial review of a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under the Social Security Act.[1] The court has carefully reviewed the pleadings and finds oral argument would not be helpful.

For the reasons set forth below, the Court remands the matter to the Commissioner for further findings.

## STANDARD OF REVIEW

 Review of the Commissioner's decision is limited to determining whether substantial evidence in the record as a whole supports the factual findings, and whether the correct legal standards were applied.[2] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion".[3] Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[4] The court may neither re-weigh the evidence nor substitute its discretion for that of the Commissioner.[5] Where the evidence as a whole can support either the agency's decision or an award of benefits, the agency's decision must be affirmed.[6]

## PROCEDURAL HISTORY

On January 30, 1998, Ms. Hendrix, age 27, applied for DIB alleging an inability to work since February 10, 1997 as a result of

---

1. 42 U.S.C. §§ 401–433.

2. See *Castellano v. Secretary of Health & Human Services,* 26 F.3d 1027, 1028 (10th Cir. 1994); *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1497–98 (10 Cir.1992); 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

3. See *Hamilton,* 961 F.2d at 1498.

4. See *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir.1992).

5. See *Hinkle v. Apfel,* 132 F.3d 1349, 1351 (10th Cir.1997); *Kelley v. Chater,* 62 F.3d 335, 337 (10th Cir.1995).

6. See *Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir.1990).

physical and mental impairments. Ms. Hendrix' claim was denied at the initial levels of administrative review.

Pursuant to her request, an administrative law judge (ALJ) held a hearing on June 21, 1999. On August 19, 1999, the ALJ issued a written decision denying Ms. Hendrix's claim.[7] The written decision included specific findings. The ALJ found that Ms. Hendrix was not disabled within the meaning of the Act.[8] The ALJ found that Ms. Hendrix had a history of severe impairments.[9] These impairments included chronic fatigue syndrome, fibromyalgia and severe headaches. However, the ALJ found Plaintiff's severe impairments did not meet or equal any listing of impairments under Appendix 1, Regulation No. 4 of the Listings.[10] The ALJ further found occupations exist in significant job numbers in the national economy that Plaintiff is capable of performing.[11]

After receipt of additional treatment records not submitted to or considered by the ALJ, the Appeals Council denied Ms. Hendrix' request for review and thus rendered the ALJ's decision of August 19, 1999 the commissioner's "final decision" pursuant to Title 42 U.S.C. § 405(g).[12]

Ms. Hendrix appeals from the final decision. She argues the ALJ erred at steps three and five of the required sequential evaluation.

### STATEMENT OF FACTS

A. *Ms. Hendrix' Statements and Testimony*

Plaintiff claimed she became disabled on February 10, 1997, when she was 27 years old, because of fibromyalgia, chronic fatigue syndrome ("CFS"), Epstein–Barr virus, and debilitating headaches. She earned a high school diploma and worked in the past as a tax examiner/clerk, sales associate, telemarketer, cashier, and prep cook.

Plaintiff testified she lived with her husband and her two eight-year-old children. She resigned from her last job as a tax examiner on February 10, 1997, her alleged onset of disability date, and one year later began receiving civil service disability retirement benefits.

Before becoming ill, Ms. Hendrix testified she had two jobs, married and had two children, played softball and took karate.

Plaintiff testified that she quit her position as a tax examiner because she was missing 25 of every 30 work days. When at work, she was able to work no more than one to two hours at a time due to fatigue. She could not finish her work, became confused and made mistakes. She testified others had to finish her work. Attempts at working other shifts and part-time also failed. Before quitting, Plaintiff testified she was able to work no more than 10 hours a week.

After leaving her last job, Plaintiff performed volunteer work at a school for approximately four months, one day a week for one hour. She thereafter watched the neighbor's children (ages one and four) full-time; then cut back to two days a week and quit after a year.

She stated her symptoms began in 1994. She was diagnosed with fibromyalgia in

---

7. ALJ decision, official record, pgs. 17–28.

8. ALJ decision, pg. 11, ¶ 12.

9. ALJ decision, pg. 11, ¶ 4.

10. ALJ decision, pg. 11, ¶ 5.

11. ALJ decision, pgs. 11–12, ¶ 12.

12. Appeals Council Decision of May 1, 2002, pgs. 6–7, official case record.

1995. She stated she has headaches; sun and light trigger tension headaches; her head sometimes feels like it is exploding and she feels as though she is looking in a window. Sometimes she sees spots and her legs and arms do not work. She feels tired all of the time; she has experienced chronic fatigue, 20 to 25 days every month; she lies down 90 percent of the time and experiences dizziness, nausea, memory loss, confusion, and depression. She lost her wedding ring twice, has lost her keys and once forgot to pick up her niece from school. Plaintiff stated her symptoms have worsened over time. Most household responsibilities including housework, meal preparation and shopping are undertaken by her husband. Medication and rest sometimes help her symptoms. She felt better for a while after leaving her last job but is getting worse over time.

On the day before the hearing, which Plaintiff described as a typical day, she woke up at noon, interacted with her children, watched television for one hour, got herself and her two daughters dressed, and went to the pool with her family. She was away from her home approximately four hours. While away, she was in the pool, walking around, doing light exercise (water aerobics), or playing solitaire in a shaded area. She went to a friend's house near the pool and visited for about an hour before going home. She went to bed about 9:30 or 10:00 p.m. and fell asleep about 11:30 p.m.

Plaintiff testified she could lift ten pounds once or twice a day; sit approximately thirty minutes at a time in a regular chair; ride approximately ten minutes in a car before experiencing neck and back pain; walk fifteen minutes at a time, stand five minutes at a time; and write five to ten minutes at a time before experiencing hand cramps. She stated she spends much of the time lying down due to pain or fatigue and dizziness.

### B. Non–Medical Evidence Submitted in Support of Plaintiff's Claim

Plaintiff submitted letters from her mother, husband and neighbor. The neighbor indicated she had insufficient knowledge of Plaintiff to respond. However, both Plaintiff's husband and mother indicated that prior to the onset of her disability she had been an active worker with varied outside interests. Both letters corroborate Plaintiff's testimony as to her current and past impairments and inability to perform usual daily activities.

### C. Medical Evidence Before the Administrative Law Judge

Because the court has determined there is substantial evidence in the record as a whole to support the conclusion of the ALJ at step three of the sequential evaluation (that Ms. Hendrix suffered from severe impairments not found in the listings: chronic fatigue and fibromyalgia), the following summary includes only evidence relevant to the step five evaluation process; to-wit, whether there exist jobs in the national economy that she is capable of performing.

On October 29, 1996, Dr. J. Richard Rees, M.D., who had treated Plaintiff for headaches since December 1995, prescribed occasional doses of demoral for pain and ativert for dizziness. Dr. Rees reported he saw her numerous times and that she required "IV" treatment for pain relief. In 1997, Dr. Rees diagnosed Epstein Barr Virus.

On November 20, 1997, Dr. Rees reported that Plaintiff suffered from severe

headaches, which are unpredictable in onset and when severe enough cause difficulty in concentration and ability to watch a computer screen for any length of time.

On December 22, 1997, Dr. Rees reported that Plaintiff had symptoms of CFS for over one year, which made it difficult for her to cope with full time work; he suggested she be listed as disabled for at least one year and recommended that she find a physician who specialized in CFS.

In January, 1998, Tyron Arnott, M.D., conducted a physical examination for complaints of migraine headaches, fatigue and leg cramps. Dr. Arnott adjusted Ms. Hendrix' medications and noted that Ms. Hendrix' day care operation could be a significant stressor contributing to her symptoms. In February 1998, Dr. Arnott further noted that Hendrix' depression had a significant impact on her symptoms.

On February 26, 1998, a physical examination by Navin K. Varma, M.D., a neurologist, was essentially within normal limits without any trigger points to indicate fibromyalgia. Dr. Varma concluded that Plaintiff had a combination stress disorder that included tension-type and migraine headaches, which would be treated independently. He advised her to adopt better stress management techniques, but he opined she did not believe all that he said to her.

On March 18, 1998, Tami Reynolds–Call, M.S.P.T., reported that Plaintiff had been a rehabilitation patient since December 10, 1997. Plaintiff reported initial head and neck pain as 10 on a scale of 1–10 and exhibited 25–50 percent limitation of range of neck motion. On Plaintiff's last visit, she reported no headache or neck pain, that she had been able to reduce the amount of medication required to control her symptoms and that her neck range of motion had improved 100 percent within normal limits. Plaintiff still had difficulty tolerating cardiovascular/endurance training for more than several minutes without excessive fatigue. Ms. Reynolds reported that Plaintiff was nearing discharge and recommended that she continue her exercises and walking.

In April, 1998, Peter Heinbecker, M.D., performed a psychological evaluation. Plaintiff presented in a good mood, interviewed well, was quite articulate, and appeared of average intelligence. Plaintiff stated she had pain in her arms and legs, headaches, fatigue, and memory problems. Plaintiff reported she generally got up at 7:00 a.m., got her children off to school, went back to bed, and performed some housework. Dr. Heinbecker noted that Plaintiff's ability to understand and remember seemed intact, and that she did not appear to have any psychiatric symptoms. Plaintiff's global assessment of functioning ("GAF") was 70. Dr. Heinbecker diagnosed her with major depression, single episode, moderate, in substantial remission.

On May 12, 1998, Robert M. Payne, M.D., examined Plaintiff for complaints of fatigue and weakness, and diagnosed candidiasis with probable associated chemical imbalance. He recommended a yeast-free diet. Dr. Payne saw her for follow-up in June and July 1998.

On August 26, 1998, Dr. John F. Miger, who had originally seen Ms. Hendrix in 1995 for complaints of aches, pains, poor sleep and nocturnal leg cramps, treated her for fibromyalgia and chronic fatigue symptoms and a history of migraine headaches. He prescribed Premarin, Paxil, Lorazepan, Amitriptyline, Lodine and Nizoral.

On February 5, 1999, Dr. Robert M. Payne, M.D., again saw Plaintiff for complaints of overwhelming fatigue associated with a spacey feeling, difficulty making decisions, and insomnia. On June 18, 1999, Dr. Payne reported that Plaintiff had been under his care for one year for CFS. Dr. Payne reported the symptoms of Plaintiff's CFS interfered with her normal daily activities and rendered her unable to work at any gainful employment for more than a few minutes at a time. Dr. Payne reported that Plaintiff's condition also affected her cognitive abilities and that he hoped continued treatment would resolve most, if not all, of her symptoms.

Richard Sanders, M.D., a State agency physician who reviewed the evidence on March 11, 1998, completed a physical RFC assessment that indicated Plaintiff, in an eight-hour day, could lift and carry 10 pounds frequently and 20 pounds occasionally; push and/or pull the same weight with both her upper and lower extremities; and sit, stand, and/or walk (with normal breaks) up to six hours a day. Dr. Sanders concluded that the medical evidence revealed Plaintiff could perform at least light work activities.

State agency medical consultants who reviewed the evidence on April 24, 1998, completed a Psychiatric Review Technique Form ("PRTF") that indicated Plaintiff's affective disorder resulted in slight functional limitations in her activities of daily living and social functioning; seldom caused deficiencies of concentration, persistence or pace; and had resulted in one episode of deterioration or decompensation in work-like settings.

State agency medical consultants also completed a mental RFC assessment that indicated Plaintiff had no marked mental limitations. Plaintiff was found not significantly limited in her abilities to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; sustain an ordinary routine; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from a supervisor; get along with coworkers or peers; maintain socially appropriate behavior, be aware of normal hazards and take appropriate precautions; and travel to unfamiliar places or use public transportation. Plaintiff was assessed as moderately limited in her abilities to understand, remember, and carry out detained instructions; perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances; work in coordination with or proximity to others; complete a normal workweek without interference from psychological-based symptoms; interact appropriately with the general public, respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.

On August 30, 1998, a State agency medical consultant reviewed the medical evidence and completed a PRTF which indicated that Plaintiff's affective disorder and possible somatoform/personality disorders resulted in slight functional limitations in her activities of daily living and social functioning and seldom caused deficiencies of concentration, persistence, or pace.

On September 9, 1998, William H. Tetteboro, M. D., a State agency physician, reviewed the medical evidence and agreed with Dr. Sander's physical RFC assessment that Plaintiff could perform at least light work activities.

### D. *Vocational Expert's Testimony*

The ALJ received testimony from John Hurst, a vocational expert ("VE"). Mr. Hurst was asked to assume an individual of Plaintiff's age, with Plaintiff's education and past work experience, as well as the ability to perform a limited range of sedentary and unskilled work. Mr. Hurst responded that such an individual could not perform Plaintiff's past relevant work. He testified that the hypothetical individual could perform the following sedentary and unskilled jobs, for which he provided Dictionary of Occupational Titles ("DOT") numbers and the numbers of such jobs available in the national economy: surveillance system monitor, DOT No. 379.367–010 (95,000 jobs); touch-up screener (quality control) in the printer circuit board industry. DOT No. 726.684–110 (105,000 jobs reduced by 15 percent); and semiconductor bonder, DOT No. 726.685–066 (70,-000 jobs reduced by 15 percent).

Mr. Hurst was asked to assume the individual also had the following additional limitations:

> no working with the general public, . . . the ability to respond appropriately to only minimal interaction with coworkers and supervisors, and also the ability to respond appropriately to only minimal work setting changes . . . minimal or less than routine work setting changes [,] . . . and the ability to understand, remember and carry out only simple instructions.

Mr. Hurst responded that such an individual could still perform the jobs he previously identified, but the touch-up screener and semiconductor bonder positions would be reduced an additional 10 percent.

In response to a question posed by the ALJ, Mr. Hurst testified that *all work would be precluded for a person who missed at least three to four days a month because of fatigue, pain and headaches";* . . . and *"that a person who needed to rest for longer than regular breaks would be unable to continue working."* [13]

## DISCUSSION

To determine whether an individual suffers from a disability under the regulations, the ALJ must conduct a sequential five-step evaluation.[14] The burden of proof lies with the plaintiff as to steps one through three; at steps four and five the burden shifts to the commissioner.

In the first two steps, the ALJ determines whether the claimant has engaged in substantial gainful activity, and whether the claimant has a "severe" impairment.[15] If the claimant has satisfied the first two requirements, the evaluation moves on to step three, a determination of whether the claimant's impairments meet or equal a disability described in the Listing of Impairments ("Listings").[16] If the ALJ determines the claimant has an impairment that meets or equals the Listings, the ALJ must conclude the claimant is disabled. If the claimant does not meet a Listing, the evaluation moves on to steps four and five during which an assessment is made of the claimant's residual functional capacity.[17] At step four, it is determined whether the

---

13. Official Court Record, pg. 334; hearing transcript at pg. 40 (emphasis added).

14. See 20 C.F.R. § § 404.1520(a)—(f).

15. See 20 C.F.R. § 416.920(d).

16. See 20 C.F.R. § § 416.920(d).

17. See 20 C.F.R. § § 416.920(e) and 416.920(f).

claimant can perform her past work. If the claimant cannot, the evaluation moves to step five, where it is determined whether the claimant can perform other work. The claimant must be found disabled if there is no work that they can perform.[18] On the other hand, if there is work which claimant can perform, and such work is available in significant numbers within the national economy, the claimant is not disabled and not eligible for benefits.[19]

In making the five step sequential evaluation of Ms. Hendrix' claim, the ALJ found at step one that Ms. Hendrix had not performed any substantial gainful activity since February 10, 1997, the alleged onset date.[20] At the second step, the ALJ concluded Ms. Hendrix's impairments were severe.[21] At step three, the ALJ found Ms. Hendrix' severe impairments did not meet or equal a Listings impairment.[22][23] At step four, the ALJ found that due to her severe impairments Ms. Hendrix could not perform her past relevant work.[24] At step five, the ALJ addressed Ms. Hendrix' residual functional capacity (RFC), which is the range of work activities the plaintiff can perform despite her impairments. The ALJ concluded that occupations exist in significant job numbers in the national economy that the claimant is capable of

performing; therefore, the claimant is "not disabled" within the meaning of the act.[25] Benefits were, therefore, denied.

Plaintiff challenges the ALJ's findings at steps three and five: (1) "Did Rebecca meet a listing?" and (2) "Was a proper step five evaluation made considering all of Rebecca's physical impairments and medications?" [26]

### A. Step Three Claim of Error

The ALJ found at step two that claimant suffered severe impairments from chronic fatigue syndrome (CFS), fibromyalgia, and migraine headaches.[27] At step three, the ALJ concluded these severe impairments, alone or in combination, did not meet or equal a Listings impairment.[28] Because a Listing impairment was not found, the ALJ moved to step four of the evaluation process. Plaintiff challenges the step three conclusion.

■■■ Plaintiff argues that at step three the ALJ did not properly evaluate her severe impairments, alone or in combination, utilizing the "CFIDS listing," [29] an agency ruling rather than a listing, which allows for the finding of a disabling impairment if certain findings and procedures

**18.** See 20 C.F.R. § 416.920(d).

**19.** See 20 C.F.R. § 416.920(f).

**20.** ALJ Decision, pg. 2.

**21.** ALJ Decision, pg. 5.

**22.** The Listings describe impairments which are considered severe enough to prevent a person from doing any gainful activity. See 20 C.F.R. § 404.1525.

**23.** ALJ Decision, pg. 6.

**24.** ALJ Decision, pg. 9.

**25.** ALJ Decision, pg. 10.

**26.** Plaintiff's brief, pg. 1.

**27.** ALJ Decision, pgs. 4–5.

**28.** ALJ Decision, p. 6.

**29.** SSR 99–2p. effective 4/30/99. SSRs do not have the force of law but are binding on all components of the Social Security Administration. See 20 C.F.R. § 402.35(b)(1); *Bunnell v. Sullivan* 947 F.2d 341, 346 n. 3 (9th Cir.1991) (en banc).

are met.[30] While challenging the ALJ's conclusion, Plaintiff acknowledges that neither CFS nor fibromyalgia are contained in the Listings. Ms. Hendrix asserts, however, her "severe" fatigue meets the CFIDS criteria for CFS which states, in pertinent part, "[c]laims involving CFS are adjudicated using the sequential evaluation process, just as for any other impairment." [31] Ms. Hendrix argues that the ALJ failed to follow the sequential evaluation process when determining her severe fatigue in combination with other impairments did not constitute a disabling impairment contemplated in the Listings.

Contrary to Plaintiff's argument, the record reflects the ALJ did adjudicate her claim using the required sequential evaluation process when determining if her severe impairments, alone or in combination, met a listings requirement.

First, the ALJ's utilization of the sequential process is evidenced by the Judge's acknowledgment of the medical evidence that Ms. Hendrix was diagnosed with multiple impairments, including CFS and fibromyalgia, and that such impairments were severe.[32] The ALJ's acknowledgment of these multiple ailments and the resulting severe impairments was also considered, alone and in combination, by the ALJ when assessing Hendrix' RFC.[33] The ALJ also thoroughly discussed Plaintiff's impairments within his decision and clearly stated her impairments were considered in combination.[34][35]

Furthermore, the burden of establishing disability under the Listings was on Plaintiff. Ms. Hendrix failed to adequately specify how her condition or conditions met or equaled any listed impairment.[36] She offered no evidence that any physician supported her position and she failed to present medical findings evidencing her condition or conditions were equal in severity to *all* the criteria for the one most similar listed impairment.[37] The commissioner's regulations provide that the determination as to whether a particular medical condition meets or equals a listed impairment is a medical judgment, made at the initial and reconsideration levels by

---

**30.** Among other things, DDS doctors review the evidence to determine whether the claimant meets or equals a listed impairment. See 20 C.F.R. § 404.1526 (explaining how medical equivalence to a listed impairment is determined); SSR 96–6p (clarifying policy interpretations regarding opinions of physicians or psychologists designated by the Commissioner regarding equivalence to listed impairments). Because SSR 99–2p is an agency ruling and not a listing, it is irrelevant whether the DDS doctors had the ruling before them at the time claimant's case was reviewed.

**31.** See 20 C.F.R. 404.1523 (if a severe impairment exists, the combined effect of all impairments will be considered, without regard to whether any such impairment, if considered separately, would be of sufficient severity).

**32.** ALJ Decision, pgs. 2–5.

**33.** ALJ Decision, pgs. 5, 6, 11.

**34.** ALJ Decision, pgs. 5, 6

**35.** See *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir.1988). (finding that, where the decision addressed the claimant's various impairments, there was "nothing to suggest they were not properly considered" in combination).

**36.** See *Bernal v. Bowen*, 851 F.2d 297, 300 (10th Cir.1988) (indicating it was claimant's responsibility to elicit direct clinical findings from his physician as to the presence of Listings requirements).

**37.** See *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); *Ostronski v. Chater*, 94 F.3d 413 (8th Cir.1996).

the Commissioner's designated physicians and consultative medical specialists.[38] Here, State agency physicians who reviewed the medical evidence did not find Ms. Hendrix' condition met or equaled a listed impairment.

In summary, there is substantial evidence in the record as a whole to support the conclusion of the ALJ. Therefore, Ms. Hendrix' challenge to the ALJ's step three evaluation is without merit.

## B. *Step Five Claim of Error*

Plaintiff next claims the ALJ erred at step five of the evaluation process. At step four of the evaluation, the ALJ concluded that no past relevant work could be performed and claimant had no transferable skills. Ms. Hendrix had previously been employed as an IRS tax examiner/clerk, sales associate, telemarketer, and fast food cashier and cook. She was found to have a residual function capacity (RFC) to perform a limited range of sedentary work.

■ Ms. Hendrix does not challenge the step four finding that she cannot perform past relevant work or that she has the residual functional capacity (RFC) to perform a limited range of sedentary work. She does, however, challenge the conclusion of the ALJ at step five of the sequential evaluation that occupations exist in significant job numbers in the national economy which "she is capable of performing." Claimant asserts the ALJ did not give appropriate weight to her testimony, evidence related to the severity of her impairments and to the negative effects her medication had in relation to her ability to perform the jobs outlined by the vocational expert.

At step five of the sequential evaluation process, the burden shifted to the Commissioner to show the existence of a significant number of jobs in one or more occupations in the national economy that Ms. Hendrix can perform. The burden may be met through the testimony of a vocational expert. Consideration must be given to the claimant's vocational factors and residual functional capacity. Vocational factors are the claimant's age, education and skills acquired from previous work. Ms. Hendrix was 28 at the time of the hearing and a high-school graduate with past work experience.

A vocational expert offered testimony. In response to hypothetical questions posed, the expert rendered the opinion that there are occupations existing in significant numbers in the national economy which could be performed by a 28 year old high school graduate with a residual functional capacity (as was discussed in step four of the ALJ's decision relating to claimant).[39] According to the vocational expert, occupations requiring a limited range of sedentary work consistent with claimant's RFC include surveillance systems monitor, touch-up screener, and semi-conductor bonder.[40] The vocational expert testified as to the number of such jobs available in these categories in the national economy.[41] Job availability ranged from 59,500 for semi-conductor bonder positions to 95,000 available posi-

**38.** See 20 C.F.R. § 404.1526.

**39.** ALJ Decision, pg. 10.

**40.** Id. at 10.

**41.** Id. at 10.

tions for surveillance systems monitors.[42]

During the hearing, the ALJ specifically inquired of the expert, "Now are any of the jobs given-if the person was missing three to four days a month at the very least because of fatigue, pain and maybe a headache, would that preclude all this work?" In response, the expert testified in an unqualified fashion, "Yes, it would and all other work."

The ALJ relied upon the testimony of the vocational expert and medical-vocational rules(s) 201.28 in finding that occupations do exist in significant job numbers in the national economy which Ms. Hendrix is capable of performing. Yet, the ALJ failed to address or weigh the vocational expert's opinion that a person such as Plaintiff, with a high degree of absenteeism due to fatigue, pain and headache would be precluded from doing any work. Furthermore, the opinion of the vocational expert that a hypothetical person like Plaintiff with chronic absenteeism due to fatigue, pain and headache would be unable to work at any job was corroborated by Plaintiff's physicians, Dr. Robert Payne and Dr. Richard Rees.

In *Clifton v. Chater,* 79 F.3d 1007 (10th Cir.1996), the ALJ was required to not only discuss the evidence he relied upon, but also the uncontroverted evidence not relied upon and the probative evidence he rejected. Because the ALJ failed to "set out ... specific findings" addressing the

evidence rejected and not relied upon, the court reversed and remanded.[43]

In similar fashion, the ALJ in the instant case failed to adequately explain how he weighed the vocational expert's opinion that claimant would be precluded from all work by "missing three to four days a month at the very least because of fatigue, pain and maybe a headache."[44] Based on the requirement set out in *Clifton,* the ALJ is required to set out specific findings addressing this evidence that the ALJ rejected.[45]

Furthermore, Plaintiff's own testimony is that she could not work twenty-five out of thirty days and no more than 2 hours a day or 10 hours per week. In addition to the vocational expert's opinion there is other evidence in the record that Ms. Hendrix' severe impairments leave her unable to perform any work for more than 5 out of thirty work days. The ALJ's written decision fails to address this evidence that should have been taken into consideration.

## CONCLUSION

In viewing the record as a whole, the ALJ failed to meet the legal burden required at step five of the sequential evaluation. Therefore this case is remanded to the Commissioner for further proceedings to either more fully explain the ALJ's decision or award benefits.

**42.** Id. at 10.

**43.** *Clifton v. Chater,* 79 F.3d 1007, 1009–10 (10th Cir.1996); see also *Vail v. Barnhart,* 84 Fed.Appx. 1 (10th Cir.2003) (reversing and remanding the decision of the commissioner because the ALJ failed to explain in his decision whether or how he evaluated the vocational expert's negative responses to the ALJ's hypothetical questions); *Miller v. Barnhart,* 2003 U.S. Dist. LEXIS 23574 (reversing and remanding the decision of the commissioner because the ALJ failed to sufficiently explain the "little weight" given to the claimant's treating physician).

**44.** Official Court Record, pg. 334; hearing transcript at pg. 40.

**45.** See *Clifton* 79 F.3d at 1009–10.